# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1505 | **DATE** | 11/8/2002 |
| **CASE TITLE** | Holy Cross Hospital vs. Banker's Life & Casualty Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Defendants Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, HealthStar's Motion for Summary Judgment on Count III of Plaintiff's Complaint (Doc. # 129-1) and Defendant Banker's Life and Casualty Company's Motion for Summary Judgment are both denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | NOV 1 2 2002 date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |

courtroom deputy's initials   jar

U.S. DISTRICT COURT CLERK
02 NOV -8 PM 2: 11
10 ED-DN date/time received in central Clerk's Office

Document Number
162

NOV date mailed notice
mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| HOLY CROSS HOSPITAL, | ) | |
| | ) | No. 01 C 1505 |
| Plaintiff, | ) | |
| | ) | HONORABLE DAVID H. COAR |
| v. | ) | |
| | ) | |
| BANKERS LIFE AND CASUALTY | ) | |
| COMPANY and HEALTHSTAR, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Defendant HealthStar's Motion for Summary

Judgment on Count III of Plaintiff's Amended Complaint and Defendant Banker's Life and

Casualty Company's Motion for Summary Judgment. For the reasons set forth below, this Court

denies both Defendants' motions for summary judgment.

DOCKETED

NOV 1 2 2002

## I. FACTUAL BACKGROUND

Plaintiff Holy Cross Hospital ("Holy Cross" or "Plaintiff") is a health care provider.

Defendant HealthStar, Inc., formerly known as Preferred Care Network or PCN, ("HealthStar")

is a corporation that enters into contracts to coordinate the delivery of health care services.

HealthStar's coordination efforts lead it to create contracts with three types of organizations.

First, HealthStar contracts with various entities who are responsible for providing health care

services to individual patient populations (e.g., employers, labor unions, health benefit trusts).

Second, HealthStar contracts with various health care providers, such as Plaintiff, who agree to

afford services at a discounted rate to the patient populations within HealthStar's network of

1



contracts in exchange for a reasonably guaranteed inflow of patients. Third, HealthStar contracts

with various "third party payors" that become responsible for payment of health care expenses,

the most common example being insurance companies, such as Defendant Banker's Life and

Casualty Company ("Banker's Life"). Although HealthStar does not apply the label to itself in

its filings, lay people might describe it as a preferred provider organization, or PPO.[1]

## A. Relationship Among the Parties, 1985- September 30, 1996

In 1985, Holy Cross and HealthStar agreed on a contract to make Holy Cross a part of

HealthStar's preferred provider network. Under the contract, the hospital agreed to provide

health care to people who were members of the HealthStar network at pre-set discounted rates.

The contract was amended twice, in 1988 and in 1994. The 1988 amendment established a new

schedule of rates for hospital services to patients in the HealthStar network. The 1988

amendment also contained an automatic renewal provision, known as an "evergreen clause." In

1994, Holy Cross and HealthStar agreed upon another amendment to the contract that established

a new schedule of agreed upon fees. By its terms, the 1994 amendment remained in effect for

two years; it expired on September 30, 1996.

Under both the original and amended contracts, Holy Cross would submit its bills at retail

rates to HealthStar. HealthStar, in turn, would reprice the bills according to the pre-set rates and

then submit the repriced bills to the third party payors. The third party payors, then, would remit

payment to Holy Cross. Holy Cross' computer system made internal adjustments from the billed

---

[1] Indeed, all the parties agree that HealthStar is a Preferred Provider Organization. See
Banker's Life Mot. for Summ. J. at 3, ¶ 3 ("HealthStar is a Preferred Provider Organization (i.e.
PPO)."); Holy Cross' Resp. to Banker's Statement of Mat. Facts Claimed Undisp. at 1-2, ¶ 3;
HealthStar's Resp. to Banker's Statement of Uncont. Facts at ¶ 3.

amount to the receivable amount to reflect the acceptable discounts under the relevant contracts.

Banker's Life has been one of the third party payors with which HealthStar had a contract since July 1988. Banker's Life was therefore among the companies that submitted payment to Holy Cross for services rendered to patients in the HealthStar network.

## B. Relationship among the Parties, September 30, 1996 – October 1, 2000

Immediately after the amended contract expired on September 30, 1996, nothing changed among the parties for several months. Apparently, it is fairly common in the managed health care industry to continue dealings after the expiration of a contract in anticipation of a new contract being agreed upon. See HealthStar's Rule 56.1(a)(3) Statement of Uncontested Facts, at ¶ 44 [hereinafter "HealthStar's Facts"].[2] Indeed, the original contract between Holy Cross and HealthStar expired on July 31, 1987, but it was not amended or renewed until July 7, 1988. At the time of its amendment, the parties agreed to extend the previous contract for 11 months so that the parties would not have a gap in their otherwise valid contract. (HealthStar's Facts, at ¶¶ 19-20).

In early 1997, Holy Cross hired Health Check, a health care consulting company, to perform an audit of its accounts and practices. On May 10, 1997, Carole Kelly, the founder and CEO of Health Check, notified Holy Cross that the contract with HealthStar had expired on September 30, 1996. After the contract expired, Holy Cross had still been receiving payments in

---

[2]Pursuant to Local Rule 56.1(a)(3), parties seeking summary judgment are required to submit "a statement of material facts as to which the moving party contends there is no genuine issue [of fact]." Loc. R. 56.1(a)(3). In this case, both Banker's Life and HealthStar filed for summary judgment, so both have also submitted statements of material facts that they contend are undisputed. Unless Holy Cross disputed the facts, the Court will cite to the Rule 56.1(a)(3) statements without further notation. The Court will note in the text where the parties disagree about certain facts.

accordance with the rates in the 1994 amendment. Health Check encouraged Holy Cross to recover the difference, which was calculated at $838,000, between the expired discounted rates and the retail rates.[3]

On July 3, 1997, Holy Cross, through Kelly, notified HealthStar that it would be seeking reimbursement for the underpayments on the contract. Later in the Summer of 1997, Brian Walsh, the Chief Financial Officer (CFO) of Holy Cross, together with Mark Clement, the Chief Executive Officer (CEO) of Holy Cross, decided not to pursue a recovery strategy for the underpayment, opting instead to negotiate with HealthStar towards the establishment of a new rate schedule. The decision not to pursue a recovery strategy remained in effect until Mark Clement's departure from Holy Cross in March 2000. Later in 1997, the relationship between Health Check and Holy Cross ended.

In 1999, Dan Williams succeeded Brian Walsh as the CFO of Holy Cross. Williams requested that Joann Kirby, the Operations Manager at Holy Cross, organize all of the hospital's existing managed care contracts. When they rediscovered that the HealthStar contract had an expired rate agreement, Williams urged Kirby to begin negotiations with HealthStar toward a new contract. Holy Cross asserts that HealthStar told Kirby that the parties had already executed a new contract and HealthStar offered to send a copy. See Holy Cross' Combined Statement of Additional Facts Require Denial of HealthStar and Banker's Mot. Summary J., at ¶¶ 35-39 [hereinafter "Holy Cross' Add'l Facts"]. HealthStar disputes that assertion, claiming that Kirby

_____

[3]Health Check had a financial interest in pursuit of the underpayments, as its would retain 35 percent of any underpayments it recovered successfully. If it recovered no moneys, Health Check would receive no payment. Both Defendants suggest that this contingent fee contract led Health Check to act improperly. This Court does not dictate preferred contractual arrangements between parties. Consequently, the Court rejects the implication of impropriety.

did not ask for a current contract; rather HealthStar asserts that Kirby asked for an updated contract "reflective of the changes in the [managed care] industry." See HealthStar's Rule 56.1(b)(3)(A) Resp. to Holy Cross' Add'l Facts, at 13. In any event, on July 13, 1999, Holy Cross sent HealthStar a contract proposal, proposing new rates. On October 11, 1999, HealthStar sent a counterproposal to Holy Cross. Holy Cross approved HealthStar's counterproposal on December 15, 1999, but the contract was never executed.[4]

In March 2000, Holy Cross asked Health Check to return and perform an additional audit. Health Check quickly identified the HealthStar contract as a source of significant underpayments, as no new rate agreement had been entered since the previous rates expired on September 30, 1996. In late June 2000, Holy Cross decided to stop all negotiation efforts with HealthStar and pursue recovery of the alleged underpayments.

On August 31, 2000, Holy Cross sent a letter to Banker's Life which represented that there was not a valid rate contract between Holy Cross and HealthStar. This was the first time that Banker's Life was made aware of the dispute between Holy Cross and HealthStar. Banker's Life directed their inquiries about the contract to HealthStar, and HealthStar maintained that it had a valid contract with Holy Cross. Meanwhile, Holy Cross initiated rebilling and collection activities to individual patients for outstanding amounts that reflected discounts taken under the September 30, 1996 agreement. As late as October 17, 2000, HealthStar remained listed on Holy Cross' pamphlets and websites as a participating PPO. The conflicts arising from the contract led Holy Cross to initiate litigation in this court.

---

[4]HealthStar asserts that it sent a new contract to Holy Cross in February of 2000. (HealthStar's Facts at ¶ 49). Holy Cross contends it never received the contract. (Holy Cross' Response to HealthStar's Facts, at 11). The parties agree that the contract was never executed.

## C.    Procedural History of this Lawsuit

On March 2, 2001, Plaintiff filed a three count complaint against HealthStar and Banker's Life. Count I of the complaint seeks recovery of benefits Holy Cross believes it is owed under welfare benefit plans governed by the Employment Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. Count II of the complaint seeks recovery of benefits Holy Cross believes it is owed under welfare benefit plans that are not governed by ERISA. Count III of the complaint seeks a declaratory judgment that the contract between Holy Cross and HealthStar expired on September 30, 1996 and that HealthStar was not entitled or authorized to reprice Holy Cross' bills or take any discounts subsequent to that date.

Banker's Life filed an amended four count cross-complaint against HealthStar on August 30, 2001. Count I of Banker's Life's amended cross-complaint alleges that HealthStar is required to indemnify Banker's Life for any damages under the terms of the contract between them. Count II of the amended cross-complaint alleges, in the alternative, that HealthStar is required to contribute a portion of the damages commensurate with the degree of fault attributable to HealthStar. Count III of the amended cross-complaint alleges that HealthStar is a fiduciary to certain ERISA plans, and that it breached its fiduciary duties. Count IV of the amended cross-complaint seeks a declaratory judgment that HealthStar has a duty to defend the lawsuit for Banker's Life and indemnify Banker's Life in the event of an adverse judgment. The basis in fact for the first three counts is the same: HealthStar failed to inform Banker's Life that the status of the Holy Cross contract was questionable. The fourth count is premised on an interpretation of the contract between HealthStar and Banker's Life. HealthStar filed counterclaims against Holy Cross and third party Health Check, but the counterclaims were dismissed without

prejudice on March 11, 2002. See Holy Cross Hosp. v. Banker's Life & Cas. Co., No. 01 C 1505, 2002 WL 389544 (N.D. Ill. Mar. 13, 2002).

On December 28, 2001, Holy Cross amended its complaint to add three additional third party payors as defendants: Unicare Life and Health Insurance Company ("Unicare"), United Wisconsin Health Insurance Company ("United Wisconsin"), and Alta Health and Life Insurance Company ("Alta"). On August 7, 2002, this Court dismissed the complaint against Unicare and Alta because they merely provided insurance to employee welfare benefit plans, they were not the actual plans themselves; ERISA requires suits against the plans. See Holy Cross Hosp. v. Banker's Life & Cas. Co., No. 01 C 1505, 2002 WL 1822916 (N.D. Ill. Aug. 7, 2002). Holy Cross and United Wisconsin settled the dispute between them later in August, so this Court granted Plaintiff's Motion to Voluntarily Dismiss the Claim pursuant to Rule 4(a) of the Federal Rules of Civil Procedure.

Both remaining Defendants, Banker's Life and HealthStar, moved for summary judgment in May 2002. Due to delays in the discovery process, those motions were stricken on July 17, 2002. On August 20, the Court granted both defendants' motions for leave to refile their summary judgment motions. Oddly, only HealthStar refiled a summary judgment motion; Banker's Life never did. Since then, the parties have behaved as though the grant of Banker's Life's Motion for Leave to Refile magically revived the summary judgment motion that was filed in May. Holy Cross filed a Response to Banker's Life's Statement of Material Facts Claimed to be Undisputed that corresponds to the paragraph numbers in Banker's Life's stricken Statement of Material Facts; Banker's Life filed a Reply Memorandum in support of its Motion for Summary Judgment. Since the Court granted the parties leave to refile their summary judgment

7

motions, the submissions of all three parties have focused on the question of whether a contract existed between Holy Cross and HealthStar after the expiration of the 1994 amendment on September 30, 1996. Although the Court is reluctant to consider Banker's Life's original summary judgment motion at all, under these circumstances, the Court will only consider those portions of Banker's Life's original summary judgment motion that pertain to the contractual issue between Holy Cross and HealthStar. Banker's Life's attempt to win summary judgment against HealthStar is a casualty of its failure to refile a summary judgment motion. All of the parties are admonished in the future to address their briefing only to documents that are still pending and valid before this Court. The Court will not tolerate similar procedural breaches in the future.

In its summary judgment motion, HealthStar argues first that the expiration of the 1994 amendment did not terminate the contract. Next, HealthStar claims that the conduct of the parties after the agreement expired manifests an intent to be bound by the terms of the expired agreement. Third, HealthStar claims that Holy Cross' conduct after the expiration of the agreement resulted in ratification of the contract. Finally, in the alternative, HealthStar contends that Holy Cross should be estopped from asserting HealthStar's conduct was improper under the doctrine of promissory estoppel. Banker's Life 's position with respect to the claims against Holy Cross is nearly identical to HealthStar's. Like HealthStar, Banker's Life asserts that Holy Cross ratified the contract through its behavior. Banker's Life also asserts that an equitable doctrine should prevent Holy Cross from seeking recovery under the contract, although it asserts laches, whereas HealthStar asserted promissory estoppel.

## II. DISCUSSION

## A. Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Kamler v. H/N Telecommunication Services, Inc.</u>, 305 F.3d 672, 677 (7th Cir. 2002). A genuine issue of material fact exists for trial when a reasonable jury could return a verdict for the party opposing summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Hedberg v. Indiana Bell Tel. Co.</u>, 47 F.3d 928, 931 (7th Cir. 1995). When determining whether a genuine issue of material fact exists, the Court considers the evidence and all proper inferences therefrom in the light most favorable to the non-moving party. <u>See Neuma, Inc. v. AMP, Inc.</u> 259 F.3d 864, 871 (7th Cir. 2001). Cases involving the interpretation of contractual documents are often well-suited to disposition on summary judgment. <u>See Neuma, Inc.</u>, 259 F.3d at 871; <u>Grun v. Pneumo Abex Corp.</u>, 163 F.3d 411, 419 (7th Cir. 1998).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. <u>See</u> Fed. R. Civ. P. 56(e); <u>Michael v. St. Joseph County, et al.</u>, 259 F.3d 842, 845 (7th Cir. 2001); <u>Albiero v. City of Kankakee</u>, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, <u>see Wolf v. Northwest Ind. Symphony Soc'y</u>, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, <u>see Albiero</u>, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails

to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## B.     Jurisdiction and Assignee Standing

Before addressing the merits of the claim, the Court must address the threshold jurisdictional question of standing. See Rosetto v. Pabst Brewing Co., Inc., 128 F.3d 538, 539 (7th Cir. 1997) (characterizing standing as a "critical threshold question" the absence of which can "preclude . . . subject-matter jurisdiction"). Plaintiff, Holy Cross Hospital, is a health care provider. Plaintiff's patients must assign their insurance benefits to the hospital in order to receive treatment. As an assignee, Holy Cross asserts that it is a beneficiary of the plan for purposes of ERISA. Although the text of ERISA does not explicitly include assignees among those eligible to file suit, 29 U.S.C. § 1132(a) (authorizing plan participants, plan beneficiaries, plan fiduciaries and the Secretary of Labor to file suit) the Seventh Circuit has held that health care provider assignees may file actions for the collection of benefits. See Morlan v. Universal Guar. Life Ins. Co., 298 F.3d 609, 615 (7th Cir. 2002) ("The cases . . . carve an exception for medical benefits assigned to a health-care provider in exchange for health care) (citing Principal Mutual Life Ins. Co. v. Charter Barclay Hospital, Inc., 81 F.3d 53, 55-56 (7th Cir.1996)); see also Kennedy v. Connecticut Gen. Life Ins. Co., 924 F.2d 698, 700 (7th Cir. 1991) ("[A] combination of statutory text and Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), shows that [29 U.S.C.] § 1132(a)(1)(B) supplies jurisdiction when a provider of medical services sues as

10

assignee of a participant."). This is an exception to the otherwise strict interpretation of the text of ERISA. See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, —, 122 S. Ct. 708, 712 (2002) ("We have . . . been especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text.") (quoting Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985)).

Although Holy Cross does have standing to bring this lawsuit, their behavior prior to filing stretches the logic for permitting provider standing in ERISA cases. Despite being excluded from the statute, health care providers who are assignees of benefits are granted standing on the theory that their interests are aligned with the actual beneficiaries of the plans. Here, Holy Cross' interests diverge from the beneficiaries interests in some pertinent respects. The beneficiaries' interest is in receiving the health care services provided for in their employee welfare benefit plan and in having those services paid for at the rate provided for in the plan. Plaintiff's sole interest is in receiving payment for services rendered. In this case, Holy Cross initiated balance billing and collection activities against the beneficiary-assigners prior to filing this litigation, yet it claims that the balances owed are owed, at least in part, under ERISA benefit plans. To the extent that is the case, Holy Cross is the exclusive legal recipient of the financial benefits owed under those plans pursuant to the assignation agreement. Seeking recovery from the individual patients who were the original beneficiaries of the plans while simultaneously seeking recovery under the plans clearly demonstrates the divergence of Plaintiff-assignee's interest from the original beneficiaries' interests.

This situation can occur when the contractual instruments governing payment of services are outside of the plan itself. What appears to have occurred here is that the claims were

11

approved, processed according to the terms of the plans, and then the hospital was paid (or possibly underpaid) by the terms of its alleged contract with HealthStar. To the extent the hospital was underpaid, it is far from clear that Banker's Life tendered less money than *the plan* required. What seems much more likely here is that Banker's Life tendered less money than *the contract* between Holy Cross and Health Star required.

The relationship between the plan and the contract is not transparent at this point, in part because there has been no evidence of any ERISA plans submitted on the summary judgment proceedings. This is very odd in an ERISA case for denial of benefits, where the cases are usually decided by reference to the plan itself. See O'Reilly v. Hartford Life & Accident Ins. Co., 272 F.3d 955, 959 (7th Cir. 2001) (claims of denial of ERISA benefits "normally" decided by "examin[ation of] the plan documents and interpret[ation] ... under the federal rules of contract interpretation"). In a "normal" case, individual beneficiaries are not in a position to contract for discounted rates for health care services. In all likelihood, the original beneficiaries are blissfully unaware of the terms of the contract between HealthStar and Holy Cross. They assign their benefits to the hospital, pay their required share under the relevant plan, and receive the necessary health care. Here, the hospital turned around and sought payment of moneys from the beneficiary-assignors that were owed to the hospital by a third party under the terms of the ERISA plan. This case certainly represents the logical limit of provider standing. Since health care providers do have standing in this circuit, however, this Court is empowered to hear the case.[5]

---

[5] After having this case pending for nearly two years, the Court would be inclined to retain supplemental jurisdiction over Counts II and III of Holy Cross' Complaint, even if Count I were dismissed.

## C.    THE CONTRACT CLAIMS

Holy Cross and HealthStar agreed in 1994 on a set of rates that would remain in effect for

two years. On September 30, 1996, the schedule of rates they agreed upon expired. Holy Cross

contends that the expiration of the rates terminated the entire contract because it was missing an

essential term. HealthStar and Banker's Life both dispute that claim. The defendants' summary

judgment claims can be divided into three distinct inquiries: 1) whether equitable doctrines

(laches, promissory estoppel) preclude Holy Cross' efforts in this lawsuit; 2) whether the parties

had a contract after the expiration of the 1994 amendment and, if so, what were its terms; and 3)

whether Holy Cross ratified a contract with HealthStar through its post-expiration behavior.

### 1.    Application of Equitable Doctrines to preclude Holy Cross

Both Defendants assert that equitable doctrines should preclude Holy Cross from

pursuing this litigation, though they choose different doctrines. Banker's Life asserts that laches

should prevent Holy Cross from being able to recover. HealthStar asserts that promissory

estoppel should terminate Holy Cross' efforts. Both claims are unavailing.

#### a.    Banker's Life's Assertion of Laches

"The doctrine of laches is derived from the maxim that those who sleep on their rights

lose them." Chattanooga Mfg., Inc. v. Nike, Inc., 301 F. 3d 789, 792 (7th Cir. 2002). Laches

requires proof that (1) the plaintiff did not diligently pursue its legal rights and (2) the delays

caused prejudice to the defendant. See Nat'l R.R. Passenger Corp. v. Morgan, — U.S. —, 122 S.

Ct. 2061, 2077 (2002). Laches is a particularly useful doctrine for claims that do not have a

positive statute of limitations, as it sets an equitable boundary beyond which plaintiffs cannot

seek recovery. Cf. Morlan v. Universal Guar. Life Ins. Co., 298 F.3d 609, 620 (7th Cir. 2001)

13

(discussing appropriateness of laches because there are "no fixed time limits on reopening a bankruptcy proceeding"). This allows for parties to settle their affairs without having to endure the perpetual uncertainty of prospective litigation. Where there are applicable statutes of limitations, courts should look, in part, to the applicable state statutes of limitations in determining whether to apply the laches doctrine. See Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 821 (7th Cir. 1999). Here, the applicable statute of limitations for claims for denial of benefits is ten years. See 735 Ill. Comp. Stat. 5/13-206; Daill v. Sheet Metal Workers' Local 73 Pension Fund, 100 F.3d 62, 65 (7th Cir. 1996) ("[W]here a [plaintiff] ...seeks[] to recover benefits purportedly due . . . under the terms of an ERISA plan . . . the most analogous Illinois statute of limitations is the ten-year limitations period ... [of] 735 Ill. Comp. Stat. 5/13-206.). If Plaintiff's delay is adjudged from the date of the contract's expiration (September 30, 1996), Holy Cross initiated the lawsuit less than halfway through the statute of limitations period.

The Seventh Circuit has allowed that under some circumstances the doctrine of laches can be used to contract the applicable statute of limitations. See Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix, 283 F.3d 877, 881 (7th Cir. 2002). Where a plaintiff leads a defendant to believe it will not file suit *and* the defendant's ability to defend is specifically impaired by the delay, laches can bar the plaintiff from suing. Id. at 882. Although laches can shorten the length of the statute of limitations for equitable reasons, the circumstances would have to be more compelling than they are in this case. Here, Banker's Life only learned of the contractual dispute between Holy Cross and HealthStar on August 31, 2000. The Plaintiff filed suit slightly more than six months later. The Court cannot find a case (and Banker's Life

14

has certainly not cited one[6]) where laches was used to estop a Plaintiff from bringing suit less than halfway through the applicable statute of limitations period. Under these circumstances, Holy Cross' delay in filing can hardly be seen as unreasonable, especially as it pertains to Banker's Life. When Banker's Life learned of the dispute, it was already at the brink of litigation.

Furthermore, Banker's Life cannot demonstrate the sort of prejudice that the laches doctrine contemplates. "[T]he prejudice contemplated by laches stems from the loss of evidence diminishing the defendant's chance of success at trial." Zelazny v. Lyng, 853 F.2d 540, 543 (7th Cir. 1988). Banker's Life does not demonstrate any prejudice of this sort in its motion. Banker's Life asserts that the delay increased the amount of damages exposure in this lawsuit. In other words, "I wish they would have filed sooner." The only other prejudice it asserts is that Holy Cross sought collection from people whom Banker's Life insures and "caused significant disruption to Banker's Life business activities and . . . damaged Banker's Life's ongoing relationships with its group plan members and insureds." See Banker's Life & Cas. Co. Mot. for Summ. J. at 28. In other words, "I wish it would never have come to this." Litigation is costly and the risk of litigation is one of the costs of doing business. The harm flowing from litigation and activity in anticipation of litigation is not grounds for the application of the laches doctrine. While the Court has some sympathy for Banker's Life's position, as it was a latecomer to this dispute, its assertion of laches against Holy Cross must fail.

---

[6]Banker's Life cites the following inapposite cases: Golden v. McDermott, Will & Emery, 702 N.E.2d 581, 589–90 (Ill. App. Ct. 1998) (where laches was applied to bar suit when the suit was brought after the end of the relevant statute of limitations); Herman v. Chicago, 870 F.2d 400, 401 (7th Cir. 1989) (reversing the district court's grant of summary judgment on ground of laches in 19 month delay in employment case, but affirming on other grounds);

### b. HealthStar's assertion of Promissory Estoppel

As both parties recognize, promissory estoppel is only applicable in the absence of an enforceable contract between the parties. See World Champion Wrestling, Inc. v. GJS Int'l, Inc., 13 F. Supp. 2d 725, 736 (N.D. Ill. 1998). The elements of promissory estoppel would be familiar to any first year law student studying for her contracts exam: 1) the plaintiff made an unambiguous promise; 2) the defendant relied on the promise; 3) defendant's reliance was both reasonable and foreseeable; and 4) defendant's reliance caused it harm. See Quake Constr., Inc. v. American Airlines, Inc., 565 N.E.2d 990, 1004 (Ill. 1990).

Holy Cross claims that HealthStar cannot establish that it made an unambiguous promise; Holy Cross is right. HealthStar claims that as long as Holy Cross was listed in its preferred provider directory, HealthStar could continue to use the discounted rate schedule in the expired 1994 agreement. First, nothing in that allegation establishes that Holy Cross made any promise relating to the rates in the 1994 agreement. Second, any such promise that could be divined from these circumstances is ambiguous at best. On this ground alone, HealthStar's assertion of promissory estoppel must fail, especially at the summary judgment phase.

### 2. Status of the contract between Holy Cross and HealthStar after the expiration of the 1994 amendment

Holy Cross' complaint seeks a declaratory judgment that the parties did not have a contract after September 30, 1996 when the 1994 amendment expired. Principles of contract interpretation guide the determination of the parties contractual obligations after the expiration of the 1994 amendment. Under Illinois law, which all parties agree applies in this case, the starting point for contract interpretation is the language of the contract itself. See Church v. General

Motors Corp., 74 F.3d 795, 799 (7th Cir. 1996) (applying Illinois law). In interpreting contracts,

the Court's "paramount concern and overriding purpose is to give effect to the intent of the

parties." Church, 74 F.3d at 799. Illinois law requires giving unambiguous terms in contract

their plain, ordinary meaning. Emergency Medical Care, Inc. v. Marion Mem. Hosp., 94 F.3d

1059, 1061 (7th Cir. 1996) (applying Illinois law). Illinois also applies the maxim that contracts

should be interpreted "as a whole, giving meaning and effect to each provision." Emergency

Medical Care, Inc., 94 F.3d at 1061. Interpretation of an unambiguous contract poses a pure

question of law. See Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp., 270 F.3d 1117, 1123

(7th Cir. 2001).

     In this case, there are really two separate contract documents to construe: the 1994

amendment ("the amendment") and the underlying preferred hospital agreement from 1985 ("the

contract"). The 1994 amendment contains a new rate schedule that expires by its terms on

September 30, 1996. The expiration term of the amendment is clear and unambiguous. The

underlying contract contains an "evergreen clause," which automatically renews the contract

unless either party gives written notice of intention not to renew. In one sense, then, these two

terms are in conflict, as they each provide for the termination of some aspect of the entire

contract, which includes the amendment. The amendment contains a conflicts clause which

provides: "To the extent that the terms and conditions of this Amendment conflict with the terms

and conditions of the [underlying contract] the terms and conditions of this Amendment shall

prevail." Holy Cross alleges that the expiration term of the amendment conflcits with the

"evergreen clause," so the amendment's expiration date prevails over the "evergreen clause."

     This would be the case if the only term of the contract between Holy Cross and

HealthStar were a set of discounted rates. The contract contains much more: a billing agreement, a pre-certification and utilization review program, and other terms governing the relationship between HealthStar and Holy Cross. As to these terms, the underlying contract remained in place after the expiration of the amendment.

So what remains is a contract that sets forth a somewhat detailed relationship between HealthStar and Holy Cross without a term setting forth a payment schedule. The contract contained a rate schedule that was originally in the 1988 amendment, but those rates were clearly superseded by the 1994 amendment and its conflict clause. The terms of the contract are unambiguous, but what both parties claim is an essential term (the money term) is missing. Holy Cross contends that without this, "the most important term of the [contract]" (Holy Cross Hosp. Comb. Mem. Law Opp'n Mot. Summ. J. Filed By HealthStar and Banker's, at 4), the entire agreement is unenforceable. While this is true under Illinois law, see Milex Products, Inc. v. Alra Laboratories Inc., 603 N.E.2d 1226, 1233 (Ill. App. Ct. 1992) (citing Academy Chicago Publishers v. Cheever, 578 N.E.2d 981 (Ill. 1991), it is not a hard and fast rule. Holy Cross' position would certainly afford the Court with an easy way out of this thicket, but Illinois law also allows that evidence can demonstrate the parties' intent to have a valid contract even absent certain essential terms. Milex Products, Inc. 603 N.E.2d at 1234 ("[T]here was sufficient evidence . . . to conclude the parties did intend to conclude the contract even in the absence of the settled price.").

The past behavior of the parties to this contract demonstrates that expiration dates were not resolutely adhered to. When the original contract expired, the parties continued negotiating and behaving as if the contract were still in place for nearly a year. Additionally, HealthStar

18

contends that automatic renewal provisions such as the evergreen clause are the industry standard precisely to avoid the problems created in the wake of the expiration of the amendment. Holy Cross contests whether evergreen clauses are the industry standard, and the question certainly remains a genuine issue of fact.

HealthStar and Holy Cross have both been clearly negligent, if not reckless, with respect to the status of this contract. HealthStar was perfectly content to leave an expired contract in place, for why should it try to negotiate rates that would only represent an increase over the previous amounts? Now it seeks to enforce the expired amounts in the 1994 rate agreement, which it tacitly extended for five years. Holy Cross, meanwhile, kept its contracts in such a mismanaged state (HealthStar's Facts, ¶ 39 ("Hospital's managed care contracts . . . were 'a ,mess, needed attention... were outdated and had not been renegotiated some of them for four or five years.'")) that it could not ascertain whether a new contract had been agreed upon three years after the amendment expired. See Holy Cross' Statement Add'l Facts, at ¶¶ 36-48.[7] Now they have come to this Court seeking a favorable interpretation of a contract that each allowed to lapse.

HealthStar asserts that the "undisputed conduct of the parties from October 1, 1996 through the Summer of 2000 . . . manifested an intention to be bound by the Contract and by the 1994 amendment rates." In assessing the parties behavior, the Court will turn to the arguments of both Defendants that Holy Cross ratified the contract through its behavior.

_____

[7]HealthStar disputes whether it ever represented to Holy Cross that an additional amendment to the contract was in place. The Court makes no judgment about whether HealthStar actually did make those representations. The simple fact that Holy Cross was in a position where it could neither confirm nor deny the existence of the contract demonstrates the recklessness at issue here.

### 3. Did Plaintiff's Behavior Ratify the Contract at the 1994 rates?

Both Banker's Life and HealthStar assert that Holy Cross' behavior after the expiration of the amendment resulted in a ratification of the contract. When a party accepts or retains benefits under a contract, the party thereby ratifies the contract. Both defendants assert that Holy Cross' acceptance of payment at the discounted rate ratified a contract at the rates in the amendment. Under this theory, Holy Cross presumably ratified the contract each time it accepted payment at the rates in the amendment.

It is less than clear what benefits, other than the moneys, Holy Cross retained that would require a conclusion that it ratified the contract. HealthStar contends that Holy Cross benefitted from significant "steerage" of patients during this time, but there has been no credible evidence about the nature of this benefit. The Court agrees that the agreement with HealthStar did result in some patient flow to Holy Cross, but it is not at all clear that this should lead to a ratification of the rates in the 1994 amendment. It seems more likely (though neither party has offered competent proof of this) that patients are "steered" towards Holy Cross Hospital because it has a relationship with HealthStar, not necessarily because of any certain rate terms. As the Court noted above, Holy Cross remained in a valid contractual relationship with HealthStar governing the other aspects of the relationship. Holy Cross' continual submission of bills to HealthStar and listing of HealthStar in its publications was part of its obligations under the existing contract. Unless Holy Cross was not entitled to *any* money in the absence of a rate agreement (which cannot be the case), it had good reason to accept the payments— it was at least part of what it believed it was owed. Other than receiving the money without complaint, Banker's Life and HealthStar point to no further facts that would entitle them to summary judgment on a

ratification theory. Therefore, summary judgment on the ratification claims must be denied.

## III.    Focus of this Case for Trial

At this point, the Court has found that the parties had a valid contractual relationship after the expiration of the 1994 amendment, but their contract did not contain a term specifying the rates Holy Cross would charge HealthStar's clients for health care services. Holy Cross, in Counts I and II of its complaint, seeks to receive payment from Banker's Life at its retail rates for health care services it provided after September 30, 1996. Although the parties behavior post-expiration does not manifest an agreement to be bound by the 1994 agreements, it does manifest an intention to remain in a relationship of some kind. Holy Cross suggests that the Defendants' efforts to prove ratification were more properly characterized as "urging this Court to imply a contract in fact from the parties' conduct." See Holy Cross Hosp. Comb. Mem. Law Opp. Mot. Summ. J. Filed by Bankers and HealthStar at 7. Holy Cross is on the right track. Holy Cross is right that the evidence marshaled at the summary judgment stage does not establish that the parties had a contract implied in fact. Any final determination of the issue will depend upon factual issues about the behavior of the parties after the expiration of the amendment which remain unresolved. If the defendants seek to establish a contract implied in fact, they will have to prove all of the classical elements of a contract were present, including mutual assent. See Samuel Williston, I A Treatise on the Law of Contracts, § 1:5 (4th ed. 1990); Barefield v. Village of Winnetka, 81 F.3d 704 (7th Cir. 1996).

In the event that the defendants cannot establish (or choose not to try to establish) an implied in fact contract, the Court will apply the equitable principles from "quasi-contract" or "contract implied in law" jurisprudence. When the dust settles, this case will be decided by

reference to the parties behavior and intentions in the period between September 30, 1996 and

the filing of this lawsuit. Significant questions of material fact remain about that behavior,

precluding summary judgment on any of the three counts in Plaintiff's complaint.

**Enter:**

David H. Coar

**David H. Coar**
**United States District Judge**

**Dated: November 8, 2002**